Matthew G. Cooper
Russell D. Harris
5286 South Commerce Drive, Suite A136
Murray, Utah 84107
Phone: (801) 284-7242
Fax:    (801) 284-7313

Daniel Ferrel McInnis
Allison Sheedy
AKIN, GUMP, STRAUSS, HAUER, &
FELD LLP
1333 New Hampshire Ave, NW
Washington, D.C.  20036
Phone:  (202) 887-4000
Fax:      (202) 887-4288
*(pro hac vice admission pending)*

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| CORPORATIONS FOR CHARACTER, L.C.<br><br><br><br><br>Plaintiff,<br><br>v.<br><br>FEDERAL TRADE COMMISSION, a<br>Federal Administrative Agency,<br><br><br><br>Defendant. | **COMPLAINT FOR<br>DECLARATORY RELIEF**<br><br>Civil Action No. 2:11-cv-00419-BCW |

## COMPLAINT FOR DECLARATORY RELIEF

Plaintiff Corporations for Character, L.C. ("C4C") alleges as follows:

1.  This case is about protecting the rights of charities and non-profit advocacy

organizations to spread their messages, identify like-minded citizens, and raise funds through the

use of one of the most effective and ubiquitous communication devices ever invented:  the

telephone.  It is also about the rights of consumers to consent to open their doors (or phone lines)

to listen to such messages—if they so choose.  The Federal Trade Commission, however, in its institutional zeal and hostility to those who use the telephone to reach citizens, funders, and consumers, disregards both the rights of those who wish to speak and those who wish to listen. Indeed, through concrete threats of litigation and punitive fines, the federal government has chilled impermissibly those constitutionally protected rights.  But free speech remains free speech, even when facilitated by technology.

2.   Plaintiff C4C, accordingly, brings this action against the Federal Trade Commission ("FTC") to protect its rights and those of the charities and non-profits it assists.  C4C seeks declaratory relief to protect rights under:  (a)  the First and Fifth Amendments to the United States Constitution; and (b) the Administrative Procedure Act ("APA").  Defendant's interpretation and implementation of the Telephone Consumer Protection Act ("TCPA"), the Federal Trade Commission Act (the "FTC Act"), and the Telemarketing Sales Rule ("TSR") unlawfully restrain noncommercial speech, violate due process, and are arbitrary and capricious under the APA.

## I.      PARTIES

3.   Plaintiff C4C is a Utah limited liability company, with its principal place of business in Murray, Utah.   C4C is a professional fundraiser that works on behalf of charitable and nonprofit organizations.  Among other services, Plaintiff C4C provides "telefunding" services on a contract basis for nonprofit organizations to accomplish advocacy and fundraising objectives on their behalf.  C4C is a small business that employees approximately 65 people in Utah.

4.   Defendant FTC is an independent administrative agency of the federal government, created by Congress and operated under the Federal Trade Commission Act, 15 U.S.C. §§ 41 *et seq.* ("FTC Act").

## II.      JURISDICTION AND VENUE

5.   This Court has jurisdiction over this action pursuant to 5 U.S.C. §§ 702 and 704, 28

U.S.C. § 1331, and 28 U.S.C. § 2201.

6.   Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e).

## III.  GENERAL ALLEGATIONS

7.   America has always supported private efforts to do good and organize for political,

religious, or charitable purposes.   From our country's earliest beginnings, it was recognized that

"the Americans make associations to give entertainment, to found seminaries, to build inns, to

construct churches, to diffuse books, to send missionaries to the antipodes; in this manner, they

found hospitals, prisons and schools."  A great source of the strength of the American people is

that we choose to privately organize to self-improve, help our neighbors, advocate, and pursue

private or public welfare.

8.   Today, there are over 920,000 charitable and non-profit organizations in the United

States registered with the Internal Revenue Services.  *See* IRS Publication 78, *Cumulative List of*

*Organizations Described In Section 170(c) of the Internal Revenue Code of 1986* (Jan. 14, 2011).

These organizations run a huge gamut of purposes and approaches.  Such organizations include

the American National Red Cross, the United Way, local Elks organizations, fraternal orders of

police, local PTAs, the Girl Scouts, the YMCA, the Church of Jesus Christ of Latter Day Saints,

the National Association for the Advancement of Colored People, the AARP, and the Sierra Club

to name just a small handful.

9.   The importance of charities and non-profits is formally recognized by the federal

government.  For example, non-profit organizations can be granted preferential tax treatment.

Likewise, as provided by the FTC Act, the FTC lacks jurisdiction over nonprofits.  The FTC Act only applies to "persons, partnerships, or corporations," 15 U.S.C. § 45(a)(2), and defines "corporation" as an entity that "is organized to carry on business for its own profit or that of its members," 15 U.S.C. § 44.  Indeed, the solicitation of contributions by nonprofit associations is not trade or commerce.

10. The President of the United States is a strong supporter of charitable giving.  In 2010, he donated $329,100 to individual charities and, in addition, directed that his $1.4 million Nobel Price Award be given to charity.

11. Like any private organization, charities and non-profits require funds to exist.  They raise such funds through a variety of means, including dues, fundraising, grants, sales of goods and services, auctions, carwashes, bake sales, membership drives and other means.

12. For charitable and non-profit organizations that fund themselves primarily or solely through fundraising efforts, fundraising is the lifeblood of the organization and without the ability to profitably raise funds, such organizations cannot exist.  Often such fundraising efforts require significant effort or expense on the part of charities and non-profits and the costs of such efforts can be a substantial expense for such organizations.  Moreover, during the recent economic downturn, it has become harder to raise funds from the general public.  Nonetheless, fundraising is critical and often has the added benefit of helping spread a specific organization's message, raise public awareness, and solicit non-monetary support from interested and like-minded individuals.  Because of the importance of fundraising, charities and non-profits can and often do use commercial firms to assist in their efforts.

13. One such non-profit organization is the Coalition for Quality Children's Media, a national, nonprofit organization, founded in 1991, whose mission is to teach children critical

viewing skills and to increase the visibility and availability of quality children's media, which primarily does business through the trade name Kids First!,  ("Kids First!").  Its website is www.kidsfirst.org.

14. Kids First! evaluates, rates and endorses children's films, DVDs, CDs, TV shows and games using volunteer, community-based juries of adults and children from diverse backgrounds and offers a variety of means to showcase and enhance consumer awareness of sponsored products.  Kids First! is widely supported by teachers, librarians, media professionals, lobbyists, policymakers, child advocates, educators, parents and families nationwide.   Kids First! is so widely recognized as a reliable advocate for children's media that it has recently partnered with Toys "R" Us—at Toys "R" Us' request—to have a section in Toys "R" Us stores of recommended films.

15. In or around 2006, Kids First! partnered with Feature Films for Families ("Feature Films"), a Utah-based company that produces, markets, and sells family friendly movies that do not contain violence, nudity, or profanity and promote traditional family values.  Plaintiff C4C is associated with Feature Films.  While Feature Films is a for-profit company, it is also a mission-driven organization and has complementary goals to Kids First! in promoting value-based media. Because of the mutual interests and goals of the two organizations, the President and CEO of Feature Films devised a charitable program with Kids First! in which the two organizations jointly would provide family friendly films and DVD technology to children's hospitals so sick and injured children who were hospitalized for extended periods of time and their parents and families would have a ready and large amount of family friendly entertainment at hand.  The agreement governing the charitable program required that 93% of the money raised be used to off-set the cost of the films to go into the hospitals. While many thousands of DVDs were

donated to hospitals, the program had limited success due to problems with the technology, high program costs, and a lack of funding.

16. In September of 2008, Kids First! and this time, C4C, agreed to partner together to promote family friendly entertainment.  C4C agreed to serve as Kids First!'s agent and conduct advocacy and charitable calls on Kids First!'s behalf.  Already familiar with the characteristics and content of Feature Films' products from the 2006 hospital partnership, Kids First! also reached an agreement with Feature Films to exclusively provide family friendly DVDs to be used by Kids First! as part of the program. Family Films agreed to provide the DVDs at below-wholesale cost.  Kids First! intended to use these DVDs both as free give-a-ways and as incentives for charitable solicitations, in order to get families to think about the qualities that are important in children's media, to create a larger base of parents willing to participate as reviewers, and to create a recommended viewing list as part of the calls.

17. Because of the costs of labor, phone lines, and other out-of-pocket expenses, seeking charitable contributions via the telephone is and has historically been an expensive endeavor for charities.  C4C, however, has developed cutting edge technology that has the potential to reduce greatly the overall costs of such messaging and fundraising.  Part of C4C's mission is to use its advanced telephone technology to deliver a higher percentage of raised funds to charities and nonprofits than any other paid telephone solicitor.  Nonetheless, the hard costs of the Kids First! calls—which included providing free DVDs to potential supporters' homes—was estimated to be and turned out to be substantial.  Thus, using a contract modeled after the hospital program agreement, Kids First! was to receive 100% of the proceeds of any successful funding raising efforts, but was required to reimburse Feature Films up to no more than 93% of the revenues to

off-set the hard costs, including those associated with providing the DVDs.  C4C agreed to do

the calls without monetary compensation and to volunteer its employees' time.

18. Initially, Kids First! contacted families throughout the United States via telephone to

inform them about Kids First!'s charitable programs and invite them to initially just serve as

Kids First! volunteers to help create a recommended viewing list of family-friendly films.

Families that agreed to serve as Kids First! volunteers were sent two free, family-friendly movies

on DVDs clearly identified with the Kids First! logo and were asked to watch the DVDs and

further agree to receive a second telephone call to answer questions about their experience.

19. These telephone calls were widely made, including to telephone numbers listed on the

National Do Not Call Registry.  The National Do Not Call Registry ("DNC") is a nationwide list

of telephone numbers maintained by the Federal Trade Commission pursuant to the TSR.

Consumers may register their telephone number on the DNC to limit, but not eliminate, the

number of calls they may receive.

20. Significantly, the TSR does not prohibit the following types of telemarketing or other

calls to telephone numbers listed on the DNC:  calls from or on behalf of political organizations;

calls from charities; call from telephone surveyors; calls from call companies with whom the

consumer has an existing business relationship; calls where there has been a prior financial

transaction between the consumer and a business; and, call from companies to whom the

consumer has provided express agreement to receive calls.

21. However, the FTC provides misleading information to consumers upon signing up for

the DNC about what types of telephone calls are and are not covered.  Specifically, the FTC

states that "[t]he National Do Not Call Registry gives you a choice about whether to receive

telemarketing calls at home," without informing consumers that calls from charities are exempt

from the DNC.  This misinformation campaign by the FTC has a chilling effect on charitable donations because it fosters a belief in consumers that charities are dishonest and breaking the law when they attempt to fundraise using the telephone, even though telephone calls seeking charitable donations are perfectly legal.

22. Indeed, the FTC bemoans the fact that is lacks jurisdiction over nonprofits, stating elsewhere to consumers that the only reason charitable telephone calls are not prohibited by the TSR is because of "limitations in the jurisdiction of the FTC."  These limitations, of course, are imposed by the U.S. Constitution and the rule of law.

23.  The initial set of calls provided information about Kids First! and asked for a charitable donation of volunteer participants' time.  Because a donation of time is a donation of a "thing of value," these calls arguably fall under the TSR's definition of telemarketing.  *See* 16 C.F.R. § 310.2(f) & (cc).  However, because the calls were issue advocacy mixed with a solicitation for the charitable contribution of time, they were exempt from the DNC requirements of the TSR.  16 C.F.R. § 310.6(a).

24. People who agreed to volunteer their time and received free movies were called again, typically a few weeks later.  Kids First! asked the volunteers several questions about the movies they had watched designed to help Kids First! complete a recommended viewer list of family-friendly films.  Kids First! also invited its volunteers to support this Kids First! project by purchasing two additional family-friendly films for $12.95.  Kids First! explained that the proceeds would go to help fund the program and complete the process of creating the recommended viewing list, which necessarily included the cost of the calling campaign itself (long distance telephone calls, postage, and the manufacture of DVDs).

25. Part of the reason that Kids First! modeled its campaign in this manner was based on C4C's prior experience working with charities, during which C4C noticed that offering to actively do something good for potential donors prior to asking for a donation led to better success in fundraising.  Kids First! also had additional plans to further develop the list of contacts it created during the campaign and to even potentially become a membership organization.

26. The follow-up telephone call was only made to individuals who had agreed to receive the movies and follow-up call.  Some of these telephone numbers were listed on the National Do Not Call Registry.  Because the family-friendly DVDs were provided as a symbolic (and highly germane) incentive to solicit charitable contributions to an organization that advocates for quality children's media, the follow-up calls were exempt from the National Do Not Call Registry provision of the TSR. 16 C.F.R. § 310.6(a).

27. In fact, Defendant FTC has previously taken the position that calls of this nature are charitable, stating that "when [a] transaction predominantly is an inducement to make a charitable contribution, such as when an incentive of nominal value is offered in return for a donation, the telemarketer should proceed as if the call were exclusively to induce a charitable contribution." *See* Telemarketing Sales Rule, 68 Fed. Reg. 19, 4590 (Jan. 29. 2003).

28. It is understandable, for example, that donation of $1 to charity from the purchase price of a good sold over the telephone in an otherwise for-profit transaction would not transform that telephone solicitation into a charitable one exempt from the DNC provision of the TSR. That is, if a car dealer were attempting to sell $30,000 cars via the telephone and donate $1 to a charity for each car sold, such a call still has an overwhelming commercial nature.

9

29. On the other hand, if a Girl Scout used the telephone to solicit a charitable donation through cookie sales to her grandmother in another state, the DNC prohibitions simply should not apply because the money raised is still a charitable contribution to the Girl Scouts under federal law.

30. In any case, any and all follow-up calls made on behalf of Kids First! were exempt at the time they were made from the National Do Not Call Registry provision of the TSR because the individuals who had agreed to receive the calls had an established business relationship with C4C by virtue of being offered, accepting and receiving the free movies, which is a financial transaction.  16 C.F.R. § 310.4(b)(1)(B)(ii).

31. The purpose of the Kids First! calling campaign was not limited to raising funds for Kids First!, but was intended to achieve a variety of charitable objectives.  As stated in Kids First!'s contract with C4C, the objectives of the campaign were to "educate the public about Kids First!'s identity, mission and goals; identify homes willing to screen family DVDs; conduct surveys and research, and gather statistics and information about how families feel about the content of entertainment media; and raise funds to be used in pursuing Kids First!'s mission and goals."

32. Kids First!'s charitable solicitation campaign was a success for Kids First!.  After paying the costs of conducting the fundraising, which, pursuant to their contract, were at or near the manufacturing cost of  $5.50 per film shipped for the DVDs and fulfillment services provided by Family Films, Kids First! retained approximately $63,000 in charitable donations raised through the calling campaign.

33. In comparison, Family Films made no profit on the effort.  All of the money reimbursed by Kids First! to Family Films went to actual costs, including the cost of long

distance and phone lines and the manufacture of almost 400,000 DVDs, and the fulfillment costs of shipping the approximately 312,000 free DVDs that were sent to people who indicated they were interested in family friendly movies.

34.  The campaign not only raised significant funds for Kids First!, it also furthered a number of Kids First!'s charitable goals.  In the course of the campaign, Kids First! educated hundreds of thousands of families throughout the United States about its charitable mission; developed a national network of volunteers; distributed free, family-friendly DVDs to hundreds of thousands of homes; developed a list of potential future volunteers, members, or donors; and enabled families to access additional family-friendly DVDs approved by Kids First!. In short, Kids First!'s charitable solicitation campaign fulfilled the goals set forth in Kids First!'s agreement with C4C, and furthered Kids First!'s charitable mission of increasing the visibility and availability of quality children's media.  It also made Kids First! a more widely-recognized organization, resulting in Toys "R" Us asking Kids First to partner with it to create a section of Toys "R" Us stores with family-friendly movies recommended by Kids First!

35. The Supreme Court has recognized that charitable organizations engage in charitable solicitation campaigns not only to raise money to support their charitable activities, but also to publicly express their views on important social issues.  As a result, the Supreme Court has repeatedly held that charitable organizations have a constitutional right to promote their views through charitable solicitation campaigns.

36. Given the interrelationship between charitable solicitation and protected speech, the Supreme Court has held that charitable solicitation campaigns cannot be regulated in the same way as ordinary commercial speech, and any regulation of charitable solicitation campaigns must be "narrowly drawn" to avoid unduly burdening First Amendment freedoms

37. The TSR inherently recognizes these important Constitutional protections as well by creating an exemption from the National Do Not Call Registry provisions for charitable solicitations.  *See* 16 C.F.R. § 310.6(a).  Hence, telemarketing calls made by professional fundraisers on behalf of nonprofit organizations may be made to telephone numbers listed on the National Do Not Call Registry.  *Id.*

38. In May 2009, Feature Films received a voluntary letter request from Defendant seeking information, data and interrogatory responses related to, among other things, its participation in the Kids First! campaign.

39. In February 2010, Defendant issued a Civil Investigative Demand to C4C demanding information related to, among other things, the Kids First! campaign.

40. During the course of its investigation, the FTC Staff stated that the Kids First! campaign was not entitled to the exemption in the TSR for charitable calls related to the National Do Not Call Registry because it considered the provision of the family-friendly DVDs on the second call to constitute a "sale" rather than a charitable contribution.  Defendant also made clear its position that each telephone call in violation of the TSR carried with it the possibility of steep civil penalties, possibly up to $16,000 per call.

41. The FTC Staff informed C4C that the FTC's position was that if a "sale" of any good or service occurred during a fundraising call, that call would not be an exempt charitable call even if all the proceeds went to the charity.  More specifically, FTC Staff said that if the Girl Scouts called any number of the National DNC registry in an effort to sell cookies to raise funds for the Girls Scouts, the FTC Staff would recommend a lawsuit against the Girl Scouts and seek a civil penalty of up to $16,000 per call.  Presumably, the FTC Staff would take the same position for any similar call made by the American National Red Cross, the United Way, local

Elks organizations, fraternal orders of police, local PTAs, the YMCA, the Church of Jesus Christ

of  Latter Day Saints, the National Association for the Advancement of Colored People, the

AARP, and the Sierra Club to name just a small handful charities and non-profits.

42. As a direct result of the positions taken by the FTC and the threat of enforcement

action and penalties for past and future calls, C4C was forced to stop the campaign it was

conducting on behalf of Kids First!.

43. On December 13, 2009, in a letter to FTC staff, Plaintiff's attorney explained that

C4C had suspended its calls on behalf of Kids First! because of the FTC investigation, enclosed

a copy of the scripting for the calls, and asked for clarification from the FTC that such calls do

not violate the TSR.

44. On December 18, 2009, the FTC responded, refused to provide clarification about the

legality of the calls, and instead suggested—in completely circular fashion—that Plaintiff should

not "resume, continue or initiate" any calls on behalf of Kids First! or any other charity on the

premise that the calls are exempt from telemarketing or from the Telemarketing Sales Rules

"unless [Plaintiff] has a sound factual and legal basis for its conclusion."

45. On August 8, 2010, Defendant transmitted a draft complaint naming Plaintiff as a

defendant and alleging, among other things, that: (1) C4C's charitable solicitation campaign on

behalf of Kids First! was, because of the DVD fundraiser, really a commercial solicitation

campaign that was subject to the "do-not-call registry" provisions of the TSR; (2) C4C's

advocacy call on behalf of Kids First! was also really a commercial solicitation and inseparable

from the second call; and (3) C4C engaged in misleading and deceptive acts and practices

because (a) the two telephone calls were connected and involved the "sale" of DVDs, and (b)

93% of the fundraising proceeds were used to pay for the costs of conducting the fundraising. Defendant also transmitted a draft stipulated judgment.

46. On or around March 14, 2011, the five Commissioners of the FTC voted to authorize a lawsuit to be filed against C4C.

47. Given this clear prior restraint on Plaintiff's First Amendment rights to noncommercial speech on behalf of Kids First!, Plaintiff seeks a declaratory judgment that Defendant is violating Plaintiff's rights and the rights of Kids First! under the Due Process Clause, that Defendant is violating Plaintiff's rights and the right of Kids First! to free speech, and that Defendant's actions are in violation of the APA.

48. Plaintiff does not contest Defendant's power to investigate and challenge violations of the TSR and violations of Section 5 of the FTC Act.  Rather, Plaintiff brings this action for declaratory relief because of Defendant's unconscionable conduct.

49. Using the systematic threat of coercive action and steep monetary penalties under its arbitrary, capricious and unlawful implementation of the TSR and Section 5 of the FTC Act, Defendant has unlawful placed a prior restraint on Plaintiff's freedom of speech.

50. Because of Defendant's prior restraint on Plaintiff's freedom of speech, Kids First! has thus been unable to deliver its advocacy message or conduct charitable fundraising in the manner of its choosing.

51. Kids First! has also been chilled in its plans to conduct future advocacy campaigns using the list of contacts of like-minded citizens it developed during the course of its calling campaign.

52. Hence, Defendant is also unlawfully suppressing the core advocacy and fundraising speech of Kids First!—which has directly harmed Plaintiff—with no procedures to safeguard First Amendment rights and in flagrant disregard of Supreme Court precedent.

53. In particular, Defendant contends that the Do Not Call Registry provisions of the TSR apply to the Kids First! campaign, and that Kids First! or its agents made false and misleading statements about the purpose of the calls and the use of donations.  These contentions are outrageous and wrong.

54. First Amendment protections for charitable organizations that engage in charitable solicitation campaigns apply here, as there are important speech rights intertwined with Kids First!'s solicitation of charitable contributions.

55. The First Amendment also protects Kids First!'s compensation arrangement with its agents.  Costs incurred by charitable organizations in the context of charitable solicitation campaigns can vary dramatically, and there is no nexus between percentage of funds retained by the fundraiser and the likelihood that the solicitation is fraudulent.  The Supreme Court has routinely struck down government attempts at cost-based limitations on charitable solicitation campaigns as unconstitutional.  Yet the FTC has imposed just such a limitation here.

56. C4C has been further chilled in its efforts to assist other non-profits and charities in those organizations advocacy and fundraising efforts as C4C is able to and prepared to support similar advocacy and fundraising efforts in the future for other organizations but is deterred from doing so because of the FTC's threats and coercion.

## STANDING

52. Plaintiff C4C has standing to bring this action for the following reasons:

   a.   Plaintiff C4C served as the agent of Kids First! for purposes of conducting a charitable calling campaign that included advocacy and fundraising and Plaintiff bring this action both on their own behalf and on behalf of Kids First!;

   b.   Defendant's unlawful interpretation and implementation of the TSR and Section 5 of the FTC Act have unduly burdened, and, until enjoined, will continue to unduly burden, Plaintiff and Kids First!'s rights of due process and free speech;

   c.   Defendant has directly threatened imminent law enforcement action against Plaintiff under Defendant's unlawful interpretation and implementation of the TSR and Section 5 of the FTC Act in order to suppress Plaintiff's protected speech on behalf of Kids First!;

   d.   Defendant's threats and acts have directly chilled and suppressed protected speech and caused C4C financial and other direct harm; and

   e.   Plaintiff is uncertain about its rights and obligations under the TSR and Section 5 of the FTC Act, necessitating declaratory relief: (i) to vindicate Plaintiff's rights; (i) to avoid prosecution of Plaintiff's exercise of a fundamental liberty; and (iii) to provide certainty to Plaintiff and other companies that assist nonprofit organizations.

53. Defendant's interpretation of the TSR and Section 5 of the FTC Act, including the formal action of the Commission voting in favor of filing a lawsuit against C4C, constitutes final agency action.  Defendant's interpretation is a definitive decision of Commission by which the rights and obligations of telefunders and the charities they represent are determined, and from which legal consequences flow.  Defendant bases its law enforcement actions on an arbitrary and capricious standard, treats its arbitrary and capricious standard as controlling, refuses to provide any clarity or guidance on what conduct is permissible under its arbitrary and capricious standard, uses its arbitrary and capricious standard to violate the First Amendment and suppress free speech, expects compliance with its arbitrary and capricious standard, and takes coercive

action against telefunders engaged in charitable fundraising campaigns on behalf of nonprofit groups that Defendant contends do not comply with the law.

54. There currently exists an actual and justiciable controversy between the parties regarding the constitutionality of the FTC's conduct, the scope of the FTC's authority, and the meaning of United States statutes and FTC regulations.

55. Declaratory relief will resolve this controversy and is necessary to eliminate the immediate effect that the FTC's interpretations of the law have had on Kids First!'s advocacy and fundraising.  Declaratory relief is also necessary to eliminate the chill that the FTC's interpretations of the law have had and continue to have on Plaintiff's and Kids First!'s First and Fifth Amendment rights.

## COUNT ONE

### Declaratory Relief
### Defendant is Violating Plaintiff's Freedom of Speech and Right to Due Process

57. Plaintiff incorporates each and every preceding paragraph by reference as though fully set forth herein.

58. Defendant FTC has pursued enforcement action against Plaintiff based on the Kids First! charitable calling campaign that has chilled the free speech of C4C and Kids First! and has deprived C4C of its rights and property interests without due process of law.

59. Pursuant to 28 U.S.C. §§ 2201, this Court may declare the rights and legal relations of the parties and grant further necessary or proper relief based on its declaration.

60. The telephone calls that C4C made on behalf of Kids First! consisted of issue advocacy mixed with a request for a charitable donations.

61. Both advocacy and charitable fundraising are highly protected forms of speech under the First Amendment. This noncommercial speech enjoys greater protections than does

commercial speech under the First Amendment, and is entitled to heightened First Amendment scrutiny.

62. The FTC's enforcement action against Plaintiff is unsupported by the law, does not further an important government interest, nor is it substantially related to an important government interest.  To the contrary, the federal government supports and encourages charitable contributions by creating special tax exemptions and other special legal privileges for nonprofits, including specific exemption from the National DNC.

63. Moreover, before conducting the charitable campaign on behalf of Kids First!, Plaintiff had no notice that Defendants would adjudge their conduct to run afoul of the law.

64. Before prosecuting Plaintiff, Defendant refused to inform Plaintiff of the standards it applied in adjudging what is permissible under the TSR and Section 5 of the FTC Act.

65. Indeed, despite official pronouncements of FTC policy to the contrary, the FTC arbitrarily adjudged Plaintiff's campaign on behalf of Kids First! to be non-charitable in nature, despite it not being within FTC's jurisdiction or discretion to second guess the Internal Revenue Service.

66. The FTC's enforcement action against Plaintiff is an improper prior restraint on protected speech in violation of the First Amendment and prevents Plaintiff and Kids First!, on whose behalf Plaintiff engaged in protected speech, from transmitting its advocacy message, from charitable solicitation, and from all future use involving the telephone of the contact list of like-minded citizens developed during the course of the Kids First! calling campaign.

67. Defendant's interpretation of the TSR and Section 5 of the FTC Act violates Plaintiff's rights to due process because before Plaintiff engages in a fundraising campaign for

Kids First! or for any other nonprofit organization, there is no way for Plaintiff to know whether it will violate the TSR or FTC Act because Defendant's standards are unconstitutionally vague.

68. Plaintiff therefore seeks a declaratory judgment from this Court that:

(a) C4C was acting as Kids First!'s agent for the calls in question and the calls must be analyzed as calls made on behalf of Kids First!, a non-profit advocacy organization;

(b) A call made on behalf of a non-profit is exempt from the national DNC prohibition TSR if made to solicit a charitable contribution (a "charitable call");

(c) A call asking for citizens to volunteer their time is an exempt charitable call;

(d) Kids First! calls asking citizens to volunteer their time to watch and rate family friendly movies were exempt charitable calls under Section 310.6(a) of the TSR;

(e) Giving citizens free goods, such as DVDs, does not transform an exempt charitable call into a commercial call;

(f) Giving citizens money, a monetary discount, or free goods, such as DVDs, are all financial transactions under the TSR;

(g) An exempt charitable call is not transformed into a commercial call simply because it leads to later calls that may not be exempt;

(h) The first set of call made by Kids First! did not become non-exempt calls because the same numbers were later called and asked to purchase DVDs;

(i) A charity or non-profit may seek a charitable contribution under the TSR in the form of the sale of goods or services;

(j) Kids First! sought charitable contributions by asking citizens to purchase DVDs to support Kids First! and its calling campaign;

(k)  An exempt charitable call does not lose its exemption because as a result of the call there is a direct or indirect financial benefit a separate commercial entity, such as a telefunder, a supplier, the telephone company or the U.S. Postal Service;

(l)  A call made on behalf of a charity or non-profit does not become a commercial call simply because the costs of making the call are high and a commercial telefunder is reimbursed for its efforts; and

(m) Calls in which Kids First! sought contributions through the sale of DVDs were exempt from the national DNC prohibitions.

69. As Plaintiff has been compelled to stop its protected noncommercial speech, without due process of law, because of Defendant's enforcement activity, there exists no adequate remedy other than that requested herein.


## COUNT TWO

### Defendant Has Violated the Administrative Procedure Act By Taking Action that Is Arbitrary, Capricious, and Contrary to Law

70. Plaintiff incorporates each and every preceding paragraph by reference as though fully set forth herein.

71. Pursuant to 5 U.S.C. § 706(2)(A), a reviewing court shall hold unlawful and set aside agency action found to be "arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law."

72. Pursuant to 5 U.S.C. § 706(2)(B), a reviewing court must hold unlawful and set aside agency action found to be "contrary to constitutional right, power, privilege, or immunity."

73. The FTC has acted arbitrarily, capriciously, and contrary to law in its enforcement action against C4C.  The FTC has taken positions contrary to the TSR and to its own policies, has ignored its own rulemaking procedures required for its actions to be valid, and is now asserting new positions for purposes of purported litigation that violate Constitutional rights.

74. The FTC's newly adopted positions constitute final agency action within the meaning of 5 U.S.C. § 704.

75. An actual and justiciable controversy exists between the parties, for which there exists no adequate remedy other than that requested herein.

## COUNT THREE

**Equal Access to Justice Act**
**Defendant's Enforcement Action is Not Substantially Justified**
**and Has Been Pursued in Bad Faith**

76.     Plaintiff incorporates each and every preceding paragraph by reference as though fully set forth herein.

77.     Pursuant to 28 U.S.C. § 2412(d)(1)(A), where the United States is not substantially justified in its position, including in prelitigation conduct, the court must make an award costs, fees, and expenses to the prevailing party.

78.     The government's behavior during the course of litigation cannot serve to offset or "cure" prelitigation conduct that was not substantially justified.

79.     Here, Defendant's enforcement activity against Plaintiff related to the Kids First! charitable calling campaign is unjustified, unexplained, and wholly without reasonable basis either in law or in fact.

80.     Pursuant to 28 U.S.C. § 2412(d)(2)(B)(i), where the United States has acted in bad faith, including in prelitigation conduct, the court may make an award of costs, fees, and expenses to the prevailing party.

81.     The government's behavior during the course of litigation cannot serve to offset or "cure" prelitigation conduct that was conducted in bad faith.

82.     Here, Defendant's enforcement activity against Plaintiff related to the Kids First! charitable calling campaign is entirely without color and has been done wantonly for improper reasons, including that Defendant is institutionally biased against any use of the telephone by nonprofit organizations.

83.     For all of these reasons, Plaintiff is entitled to all costs, fees, and expenses associated with bringing the present lawsuit to the fullest extent allowed by 28 U.S.C. § 2412

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully pray for relief and judgment as follows:

(1) That the Court render a Declaratory Judgment declaring that:

    (a) C4C calls on behalf of Kids First! are constitutionally protected, were legal, met the requirements of the TSR, and that future calls made in the same manner would also be protected from unlawful and arbitrary and capricious law enforcement threats and actions by Defendant;

    (b)  The Court will set aside and hold as unlawful under the APA all enforcement action undertaken by Defendant against C4C related to the Kids First! charitable calling campaign because the FTC's enforcement action is arbitrary, capricious, and contrary to law;

22

(c) The Court will award Plaintiff all costs, fees, and expenses associated with

bringing the present lawsuit to the fullest extent allowed by 28 U.S.C. § 2412;

(d) The Court will award Plaintiff reasonable attorneys' fees, costs and all other

fees under all other applicable laws; and

(e) The Court will award such other and additional relief as the Court deems just

and equitable.

Respectfully submitted,

Dated: May 6, 2011

By: _____/s/ Matthew G. Cooper_____

Matthew G. Cooper
Russell D. Harris
5286 South Commerce Drive, Suite A136
Murray, Utah 84107
Phone: (801) 284-7242
Fax:  (801) 284-7313

Daniel Ferrel McInnis *(pro hac vice admission pending)*
Allison Sheedy *(pro hac vice admission pending)*
AKIN, GUMP, STRAUSS, HAUER, & FELD LLP
1333 New Hampshire Ave, NW
Washington, D.C. 20036
Phone: (202) 887-4000
Fax: (202) 887-4288
*Attorneys for Plaintiff, Corporations for Character.*
*L.C.*